# THE SUPREME COURT, STATE OF WYOMING

## 2023 WY 56

APRIL TERM, A.D. 2023

June 6, 2023

IN THE MATTER OF THE J. KENT
KINNIBURGH REVOCABLE TRUST
DATED JANUARY 27, 1992, AS AMENDED
AND RESTATED:

JANEL K. KINNIBURGH, beneficiary and
Successor Trustee of the J. Kent Kinniburgh
Revocable Trust dated January 27, 1992,

Appellant
(Plaintiff),

v.

JACQUE MONCUR and ROSEMARY
STEELE, Successor Co-Trustees of the J.
Kent Kinniburgh Revocable Trust dated
January 27, 1992,

Appellee
(Petitioner).

S-22-0142

*Appeal from the District Court of Natrona County*
*The Honorable Kerri M. Johnson, Judge*

*Representing Appellant:*
> Lucas Buckley and Jeremiah James of Hathaway & Kunz LLP.
> Argument by Mr. Buckley.

*Representing Appellee:*
> Thomas A. Valdez, Mikole Bede Soto, and Trevor J. Schenk of Chapman Valdez &
> Lansing. Argument by Mr. Schenk.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY and FENN, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FENN, Justice.**

[¶1]    Janel Kinniburgh is one of the beneficiaries of the J. Kent Kinniburgh Revocable Trust (the Trust).  She filed suit against her sisters, Jacqueline Moncur and Rosemary Kinniburgh, who are the co-trustees of the Trust, alleging they breached certain fiduciary duties.  Following a bench trial, the district court ruled in favor of the Trustees on most of Janel's claims.  While the district court found the Trustees breached their duties of loyalty and impartiality, it found Janel failed to prove any damages resulted from that breach.  The district court declined to remove the Trustees or award any monetary damages.  Janel appeals, and we affirm.

## ISSUES

[¶2]    Appellant raises three issues, which we rephrase as follows:

> I.    Did the district court err when it found the Trustees did not breach their duty to inform and report?
>
> II.    Did the district court err when it found the Trustees did not breach their duties of impartiality or prudent administration?
>
> III.    Did the district court err when it did not remove the Trustees or award Appellant any damages?

## FACTS

[¶3]    James Kent Kinniburgh (Kent) was the adoptive father of five children: Jacqueline Moncur (Jacque), Rosemary Kinniburgh, Janel Kinniburgh, Donald Kevin Kinniburgh (Kevin); and Robert Keith Kinniburgh (Keith).[1]  Kent established the J. Kent Kinniburgh Revocable Trust on January 27, 1992.  The Trust was amended twice, once on September 20, 2004, and again on September 25, 2007.  During his lifetime, Kent and Jacque served as co-trustees of the Trust.  Although Jacque was a co-trustee, Kent did not share any information about the Trust with her, and he did not ask her to perform any tasks related to the Trust.  She was not given a list or inventory of the Trust's assets.

[¶4]    As a result of a car accident, Kent had been a paraplegic since he was nineteen, and as he got older, it became more difficult for him to do everyday activities.  After Kent's second wife, Georgia, died in 1991, her sister, Sharon Lohrenz, became his companion and caregiver.  In 2002, he asked Sharon to retire and move to Arizona with him.  Kent

---

[1] Because many of the parties have the same last name, we will refer to them by their first names or preferred names for clarity.

1

purchased a home in Wickenburg, Arizona, and he and Sharon moved into that home in early 2003.

[¶5]   Kent was generous with his money, and he often helped his children when they needed it.  For example, Kent gave Janel his vehicle after he moved to Arizona.  He also gave Janel money whenever she asked for it.  In 2006, Kent purchased a condo in Houston, Texas, where he allowed Rosemary to reside rent-free.  At the time he purchased the condo, Rosemary also owed Kent more than $70,000 for money he lent her in the late 1990s to purchase a tavern in Houston.

[¶6]   Kent passed away on February 2, 2016, and his Trust became irrevocable. Following Kent's passing, Rosemary was appointed as a co-trustee pursuant to Section 5.1 of the Trust.  In March 2016, the Trustees mailed each qualified beneficiary a copy of a *Notice to Qualified Beneficiaries of the J. Kent Kinniburgh Revocable Trust*.  This document informed the beneficiaries they were entitled to a copy of the Trust instrument and to the trustee's reports under Wyoming Statute § 4-10-813(c).

[¶7]   At the time of Kent's death, he still owned the condo in Houston, Texas, the house in Wickenburg, Arizona, and various mineral rights.  He also owned liquid assets worth $1,207.50.  The Arizona and Texas properties belonged to the Trust at the time of Kent's death, but the mineral rights were held in his individual name.  The mineral rights were transferred to the Trust through a summary distribution proceeding in June 2016.

[¶8]   Sections 4.1 and 7.6 of the Trust required the Trustees to pay all of Kent's bills, expenses, taxes, and probate costs.  Once Kent's expenses were paid, Section 4.2 of the Second Amendment to the Trust required the Trustees to pay the following specific gifts: 1) $50,000 to Janel; 2) $150,000 to Sharon; and 3) $5,000 to Keith.  This section of the Trust also authorized and directed the Trustees to sell the Arizona property at fair market value to pay the specific gifts.  Once the specific gifts were paid, Section 4.4 provided the net income of the Trust would be distributed to Janel and Kevin at least quarterly.  Under Section 4.7 of the Trust, upon the death of Kevin and Janel, the undistributed balance of the Trust would be distributed to Kent's grandson, Logan Moncur, and any living issue of Janel and Kevin.

[¶9]   The family gathered in Casper, Wyoming, in July 2016 to spread Kent's ashes. During this gathering, Jacque told her siblings the Trust documents were available for their review.  Jacque provided Janel and Kevin a copy of the Trust and Kent's will in the months following Kent's death.  Janel and Kevin understood the specific gifts had to be paid before they would receive any income distributions.  After this gathering, Jacque spoke to Janel and Kevin by phone on a weekly basis about what was going on with the Trust.  The Trustees did not provide any sort of written accounting or report to the beneficiaries.

[¶10]  The Trustees could not pay the specific gifts until they sold the Trust's real property.

2

Section 4.3 of the Second Amendment to the Trust gave Rosemary the option to purchase the Texas condo at fair market value within 120 days of Kent's death. Rosemary chose to exercise this option.

[¶11] Rosemary believed the fair market value of the condo to be $105,000 due to the condition of the property. According to her testimony, the ground floor of the condo flooded during Hurricane Ike in 2008, which caused the hardwood floors to warp. In addition, in 2010 a water leak from the upstairs bathtub caused mold in the kitchen, which Rosemary could never remediate. Rosemary did not talk to a realtor or appraiser when determining the fair market value of the condo. However, she knew another similar unit in her complex was sold for $109,000. She also asked a real estate attorney to run some comparable sales for her, and she reviewed the Harris County Tax Assessment for the condo, which showed a value of just over $110,000. Rosemary ultimately decided to purchase the condo for $122,000. Jacque played no role in determining the purchase price. The Trust paid the closing costs for the sale, but it did not have to pay any realtor fees. The transaction closed in early May 2016. The beneficiaries were not provided information or written documents pertaining to the sale of the Texas condo. Rosemary sold the condo in late 2017. A developer purchased the entire complex, which resulted in the owners of the condos being paid above market value. Although Rosemary testified she received more than $200,000 from the sale of the condo, she could not recall the exact amount the developer paid for the condo.

[¶12] Rosemary also paid the Trust $78,000 to pay off the note she still owed to Kent. The Trust account only had a balance of approximately $7,500 before Rosemary purchased the Texas condo and paid off the note. After receiving the $200,000 from Rosemary, the Trustees decided to start paying the specific gifts, although there was not enough money to pay all the gifts. Keith received his $5,000 gift on May 17, 2016. Janel received her $50,000 gift on July 18, 2016. Sharon received the following payments: 1) $1,000 on April 19, 2016; 2) $50,000 on May 5, 2016; 3) $15,000 on June 16, 2016; and 4) $2,500 on September 15, 2016. After making these payments, the Trustees still owed Sharon approximately $81,000.

[¶13] In November and December of 2016, the Trustees advanced Kevin approximately $12,500. These funds were paid directly to some of Kevin's creditors. Kevin and the Trustees agreed the amount he received would be taken out of his portion of the proceeds from the sale of the Arizona property. At the time the $12,500 was advanced, Kevin was the only beneficiary who had not received a distribution from the Trust. Janel was not told about the payments Kevin received, and she was not offered matching distributions.

[¶14] The Trustees knew they would have to sell the Arizona property to finish paying Sharon's specific gift. Although Sharon planned to move back to Casper after Kent's death, she agreed to stay in the Arizona house until it sold. The Trustees made it clear from the beginning the house needed to be sold, and Sharon would have to move out once it had

3

been sold. In exchange for staying in the home and keeping it ready for showings, the Trustees promised to help Sharon move back to Casper after the house was sold. The Trustees did not pay Sharon to stay in the home, and Sharon did not pay any rent while living there. While the house was on the market, the Trust continued to pay the utilities, but Sharon paid her own living expenses, including internet and groceries.

[¶15] Because neither of the Trustees resided in Arizona, they asked Sharon to help them find a realtor to sell the Arizona property. Sharon interviewed several realtors, and the Trustees signed a one-year exclusive listing contract with Jorja Beal, who had been recommended by Sharon's friends. The house was listed for sale at $465,000. The Trustees hoped the property would sell in less than six months.

[¶16] The Arizona property had extensive landscaping and a pool. Kent and Sharon could not maintain the pool or landscaping themselves, so they employed a pool maintenance company and a landscaping company. While the property was on the market, the Trustees continued to pay these same companies to provide those services.

[¶17] Unfortunately, the Trustees did not receive any offers on the Arizona house during the first year. Although the Trustees and Sharon discussed their concerns about the lack of showings with Ms. Beal, she informed them it was a "slow time" in the real estate market. After the exclusive listing agreement expired, the Trustees hired a different realtor, Alexi Crissman, and lowered the listing price to $435,000. Ms. Crissman showed the property two-to-three times a week after she took over the listing. The Trustees received two offers on the house, but they both fell through. Sharon moved back to Casper in September 2018 because she did not want to encounter bad roads during the move if the property sold in the winter. As a favor to the Trustees, Ms. Crissman checked on the property after Sharon left. The Arizona property sold in February 2019 for $413,000, and the Trustees deposited the net proceeds from the sale into the Trust's checking account.

[¶18] Following the sale of the Arizona property, the Trustees equalized the distributions to Kevin and Janel by deducting the sums Kevin had received in 2016. Janel received $166,530, and Kevin received $154,019.54. After the sale of the Arizona property, the Trust's only remaining assets were the mineral rights and approximately $12,000 remaining in the Trust Account. Janel and Kevin started receiving quarterly income payments from the mineral interests in 2019.

[¶19] In early 2019, Janel believed she was not getting information about what was going on with the administration of the Trust. In February 2019, Janel hired counsel who sent a letter to the Trustees demanding an accounting and other supporting documents. Counsel for the Trustees responded to Janel's demand in March 2019. This response included a QuickBooks check register Jacque had been keeping since immediately after Kent's death. After receiving the Trustees' response, Janel reconciled the QuickBooks check register with the bank statements and canceled checks and could not find any errors.

4

[¶20]   Janel filed suit against the Trustees in April 2020.  She alleged the Trustees breached their duty to inform and report by not sending the beneficiaries written annual accountings as required by Wyoming Statute § 4-10-813.  She also alleged the Trustees breached their duty to prudently invest Trust property by not renting out the Arizona property while it was on the market.  Janel further alleged the Trustees breached their duty to protect and prudently administer the Trust by allowing Sharon to live in the Arizona property rent-free while the Trust paid over $80,000 for utilities and maintenance.  Janel also alleged the Trustees breached their duties of loyalty and impartiality by allowing Sharon to live in the Arizona property, making the loans to Kevin, and paying Sharon's moving expenses.  She sought an accounting, monetary damages, attorney's fees, punitive damages, and the removal of the Trustees.  Following a bench trial, the district court ruled the Trustees did not breach their duty to inform and report or their duty of prudent administration.  The district court found the Trustees breached their duties of loyalty and impartiality by their conduct surrounding the purchase of the Texas condo and by paying for Sharon's moving expenses.  However, it found Janel failed to prove any damages due to this breach.  The district court declined to remove the Trustees or award monetary damages or attorney's fees.  This appeal timely followed.

## STANDARD OF REVIEW

[¶21]   We apply the following standard of review to a district court's findings following a bench trial:

> [W]e review the trial court's findings of fact for clear error and its conclusions of law *de novo*. Although the trial court's factual findings are not entitled to the limited review afforded a jury verdict, such findings are presumptively correct subject to our examination of all properly admissible evidence in the record. We do not reweigh disputed evidence and, instead, give due regard to the trial judge who assessed the credibility of the witnesses. We will not set aside the trial court's findings of fact absent clear error. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In our review, we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it.

*In re Robert & Irene Redland Fam. Tr., Dated Aug. 10, 1989*, 2019 WY 17, ¶ 13, 435 P.3d 349, 355–56 (Wyo. 2019) (*Redland*) (internal citations and quotation marks omitted).

[¶22] This case requires us to interpret portions of the Uniform Trust Code. Our rules of statutory interpretation are well established:

> In interpreting statutes, our task is to give effect to the legislature's intent. We look first to the plain meaning of the language chosen by the legislature and apply that meaning if the language is clear and unambiguous. A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. All statutes must be construed *in pari materia*; and in ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony. If, however, the wording of a statute is ambiguous or capable of varying interpretations, we employ well-accepted rules of statutory construction.

*Spence v. Sloan*, 2022 WY 96, ¶ 34, 515 P.3d 572, 581–82 (Wyo. 2022) (quoting *Matter of Longwell*, 2022 WY 56, ¶ 21, 508 P.3d 727, 733 (Wyo. 2022)). This case also requires us to interpret portions of the Trust Agreement. "The interpretation of unambiguous trust agreements is a matter of law for the court." *Forbes v. Forbes*, 2022 WY 59, ¶ 31, 509 P.3d 888, 897 (Wyo. 2022) (*Forbes II*) (quoting *Forbes v. Forbes*, 2015 WY 13, ¶ 23, 341 P.3d 1041, 1051 (Wyo. 2015) (*Forbes I*)). "[D]etermining the standard for measuring the performance of trustees is a question of law we review de novo." *Id.* (citing *Forbes I*, ¶ 23, 341 P.3d at 1051). Our precedent clearly establishes "that we may affirm the judgment of the court below for any reason supported by the record." *GOB, LLC v. Rainbow Canyon, Inc.*, 2008 WY 157, ¶ 12, 197 P.3d 1269, 1272 (Wyo. 2008) (citing *Arnold v. Day,* 2007 WY 86, ¶ 14, 158 P.3d 694, 698 (Wyo. 2007); *Johnson v. Anderson,* 768 P.2d 18, 24 (Wyo. 1989)). We will "affirm rulings of the district court for any proper reason appearing of record, even if the articulated reasons are incorrect." *Walker v. Karpan*, 726 P.2d 82, 89 (Wyo. 1986) (citing *Committee to Restore Mayor-Council Form of Government v. City of Rawlins*, 692 P.2d 944, 946 (Wyo. 1984); *Anderson v. Bauer*, 681 P.2d 1316, 1325 (Wyo. 1984); *Mentock v. Mentock*, 638 P.2d 156, 159 (Wyo. 1981)).

## DISCUSSION

[¶23] A trustee has a duty to "administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries, and in accordance with the [Uniform Trust Code]." Wyo. Stat. Ann. § 4-10-801 (LexisNexis 2021). "To establish a claim for breach of fiduciary duties, the plaintiff must show a duty based on a fiduciary relationship, breach of the duty, and the breach caused him damage." *Gowdy v. Cook*, 2020 WY 3, ¶ 27, 455 P.3d 1201, 1208 (Wyo. 2020) (citing *Acorn v. Moncecchi*, 2016 WY 124, ¶ 80, 386 P.3d 739, 762 (Wyo. 2016)). "[T]he absence of any of these elements is fatal to

the cause of action." *LaMonte v. Sanwa Bank Cal.*, 45 Cal. App. 4th 509, 517, 52 Cal. Rptr. 2d 861, 865 (Cal. Ct. App. 1996).

## I.    *Did the Trustees Breach Their Duty to Inform and Report?*

[¶24]   Under Section 7.11 of the Trust, the Trustees were obligated to render an accounting of the administration of the Trust estate as "required by law."  The Uniform Trust Code requires a trustee to "keep adequate records of the administration of the trust." Wyo. Stat. Ann. § 4-10-810(a) (LexisNexis 2021).[2]  A trustee's duty to inform and report is found in Wyoming Statute § 4-10-813 (LexisNexis 2021), which states in relevant part:

> (a) A trustee shall keep the qualified beneficiaries of the trust reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests. Unless unreasonable under the circumstances, a trustee shall promptly respond to a qualified beneficiaries request for information related to the administration of the trust.
>
> *      *      *
>
> (c) A trustee shall send to qualified beneficiaries, at least annually and at the termination of the trust, a report of the trust property, liabilities, receipts and disbursements, including the amount of the trustee's compensation, except to the extent compensation has been disclosed consistent with the requirements of W.S. 4-10-802, the allocation of receipts, disbursements, trustee compensation and expenses of administration between income and principal, a listing of the trust assets and, if feasible, their respective market values. Upon a vacancy in a trusteeship, unless a cotrustee remains in office, a report shall be sent to the qualified beneficiaries by the former trustee.  A personal representative, conservator or guardian of a deceased or incapacitated trustee may send the qualified beneficiaries a report on the trustee's behalf.
>
> (d) A beneficiary may waive the right to a trustee's report or other information otherwise required to be furnished under this

---

[2] Wyoming Statute § 4-10-813 was recently amended to add subsection (e), which becomes effective July 1, 2023, and reads: "The trustee of an irrevocable trust that was created before July 1, 2003 or which became irrevocable before July 1, 2003 may elect not to comply with subsections (b) and (c) of this section." 2023 Wyo. Session Laws Ch. 118.  This amendment is not relevant to this appeal.

section. A beneficiary, with respect to future reports and other information, may withdraw a waiver previously given.

Under Wyoming Statute § 4-10-813(b)(iii), a trustee must also "notify the qualified beneficiaries of the trust's existence, . . . of the right to request a copy of the trust instrument and of the right to a trustee's report" as required in subsection (c).

[¶25] In March 2016, the Trustees sent Janel and the other beneficiaries a copy of the notice required by Wyoming Statute § 4-10-813(b)(iii). Although Jacque began keeping detailed records of the Trust's income and disbursements through a QuickBooks check register immediately after Kent's death, she did not provide this check register or any other written accounting to the beneficiaries prior to 2019. The evidence established that prior to February 2019, Jacque tried to keep the beneficiaries informed about the administration of the Trust through weekly phone calls. However, the evidence also established she did not tell them all the details surrounding the sale of the Texas condo. After Janel hired counsel and demanded information, the Trustees promptly responded to her request, and they have continued to provide Janel copies of monthly bank statements and year-end tax returns.

[¶26] The district court found Janel "admitted at trial that [Jacque] kept her informed regarding the Trust until a dispute occurred about personal property in 2019." The district court then found Janel's "conduct leading up to 2019 was an implied waiver of the right to the trustee's report and accounting." The district court considered Janel's 2019 demand for information to be a revocation of that waiver. It further found the Trustees "promptly provided [Janel] with all documents requested in her letter." Based on Janel's purported waiver and the Trustee's prompt response to Janel's demand, the district court concluded the Trustees did not breach their duty to inform and report.

[¶27] Janel contends the district court erred when it found she waived her right to an accounting and concluded the Trustees did not breach their duty to inform and report. Janel asserts the district court's ruling "improperly shifted the burden of the Co-Trustees to inform and report to [Janel], holding that she had a duty to request information." The Trustees assert the district court correctly held they did not breach their duty to inform and report because Janel "impliedly waived" her right to annual accountings prior to 2019.

[¶28] We have not previously addressed how a beneficiary can waive the right to a trustee's report under Wyoming Statute § 4-10-813(d). Under Wyoming Statute § 4-10-1009(a) (LexisNexis 2021), "[a] fiduciary is not liable to a beneficiary for breach of trust if the beneficiary consented in writing to the conduct constituting the breach, released the fiduciary from liability for the breach or ratified the transaction constituting the breach," unless the consent, release, or ratification was induced by the fiduciary's improper conduct, or the "beneficiary did not know of the beneficiary's rights or of the material facts relating to the breach." Janel asserts this statute when read in conjunction with Wyoming Statute

8

§ 4-10-813(d) required Janel to waive her right to an accounting in writing. The Trustees contend the waiver did not have to be in writing, and it could be inferred from her conduct.

[¶29] "As a general rule a person may waive a statutory or constitutional right enacted for the benefit of that person, if that right does not affect public policy or public interest." *Skaf v. Wyo. Cardiopulmonary Servs., P.C.*, 2021 WY 105, ¶ 16, 495 P.3d 887, 893 (Wyo. 2021) (quoting *Borman v. Sweetwater Cnty. Sch. Dist. No. 2*, 627 P.2d 1364, 1368 (Wyo. 1981)). However, such a waiver is not favored, and "it must be reflected by clear, affirmative words or actions." *Id.* (quoting *Jensen v. Freemont Motors Cody, Inc.*, 2002 WY 173, ¶ 22, 58 P.3d 322, 328 (Wyo. 2002)). Wyoming Statue § 4-10-813(d) does not specifically require a beneficiary to waive the right to an accounting in writing. Wyoming Statute § 4-10-1009 provides one method a trustee could use to obtain a waiver of the duty to inform and report, but it does not necessarily follow that it requires all waivers to be in writing. When discussing waiver in other contexts, we have recognized:

> A waiver occurs when there is an intentional relinquishment of a known right manifested in an unequivocal manner. While the intent to waive may be implied from conduct, the conduct should speak the intent clearly. Silence or delay in asserting a right without more does not constitute the unequivocal manifestation of intent required for a claim of waiver. To support a claim of waiver there must be an obligation to speak or the silence or inaction must be of such duration that it shows an intent to yield a known right.

*In re RR*, 2021 WY 85, ¶ 91, 492 P.3d 246, 269 (Wyo. 2021) (internal citations omitted) (quoting *In re L-MHB*, 2017 WY 110, ¶ 32, 401 P.3d 949, 959–60 (Wyo. 2017)); *see also Jensen*, 2002 WY 173, ¶ 20, 58 P.3d at 327–28 (quoting 28 Am. Jur. 2d *Estoppel and Waiver* § 209 (2000)). "Whether a waiver was made voluntarily, knowingly, and intelligently depends upon the surrounding facts and circumstances." *Skaf*, 2021 WY 105, ¶ 16, 495 P.3d at 893 (quoting *MAM v. State Dep't of Fam. Servs.*, 2004 WY 127, ¶ 14 n.3, 99 P.3d 982, 985 n.3 (Wyo. 2004)). While we agree with the Trustees that Janel's waiver did not have to be in writing, it did need to be "manifested in an unequivocal manner." *In re RR*, ¶ 91, 492 P.3d at 269 (quoting *In re L-MHB*, ¶ 32, 401 P.3d at 959–60).

[¶30] In this case, there is nothing in the record to show Janel orally communicated a clear intention to waive her right to a trustee's report and accounting. Instead, the district court based its finding of waiver on the fact that "[f]or three years [Janel] was aware of the Trust and was advised on a regular basis regarding the administration of the Trust. Only after a dispute arose, did she allege that the Trustees breached their duty to inform and report." Thus, the district court's finding is based on Janel's silence and delay in asserting her right to an accounting.

9

[¶31]   Wyoming Statute § 4-10-813 places the onus on a trustee to render an accounting; it does not require a beneficiary to ask for one. Because Janel had "no obligation to speak," her silence was insufficient to "constitute the unequivocal manifestation of intent required for a claim of waiver." *In re RR*, ¶ 91 492 P.3d at 269 (quoting *In re L-MHB*, ¶ 32, 401 P.3d at 960); *Jensen*, 2002 WY 173, ¶ 20, 58 P.3d at 327–28 (quoting 28 Am. Jur. 2d *Estoppel and Waiver* § 209).  We find the district court erred when it found Janel implicitly waived her right to a trustee's report and accounting, and it improperly shifted the burden of requesting a report and accounting to the beneficiaries.  Because Janel did not waive her right to an accounting, the district court erred when it determined the Trustees did not breach their duty to inform and report.  Although Janel proved the Trustees breached their duty to inform and report, she also had to prove the Trust suffered damages as a result of that breach. *Gowdy*, 2020 WY 3, ¶ 27, 455 P.3d at 1208 (citing *Acorn*, 2016 WY 124, ¶ 80, 386 P.3d at 762).  Failing to show the Trust sustained damages would be fatal to her cause of action for breach of the duty to inform and report. *LaMonte*, 45 Cal. App. 4th at 517, 52 Cal. Rptr. 2d at 865.

[¶32]   Janel admitted she was able to reconcile the QuickBooks check register with the bank statements and canceled checks and the records "checked out."  Although she cannot prove any funds were missing or misappropriated by the Trustees, Janel argues without the ability "to review and understand the actions of the Trustees, gross breaches of the duties of loyalty and impartiality were allowed to occur and materially impacted the benefit [she] was to receive from the Trust."  For reasons discussed below, we conclude the Trustees did not breach their duties of prudent administration, loyalty, or impartiality.  Therefore, Janel failed to prove the Trust suffered any loss as a result of the Trustees' breach of their duty to inform and report.  We affirm the district court's decision not to award any damages for the Trustees' breach of their duty to inform and report, although we do so on the grounds that Janel failed to prove damages rather than on a finding she waived her right to an accounting.

## II.    Did the Trustees Breach their Duties of Impartiality and Prudent Administration?

[¶33]   The Uniform Trust Code imposes a duty of impartiality upon a trustee.  When a trust has two or more beneficiaries, a trustee must "act impartially in investing, managing and distributing the trust property, giving due regard to the beneficiaries' respective interests." Wyo. Stat. Ann. § 4-10-803 (LexisNexis 2021).  The duty of prudent administration is found in Wyoming Statute § 4-10-804 (LexisNexis 2021), which requires a trustee to "administer the trust as a prudent person would, by considering the purposes, terms, distributional requirements and other circumstances of the trust."  To satisfy this standard, a trustee must "exercise reasonable care, skill and caution." *Id.*  Under Wyoming Statute § 4-10-805 (LexisNexis 2021), "[i]n administering the trust, the trustee may incur only those costs that are reasonable in relation to the trust property, the purposes of the trust and the skills of the trustee."

[¶34] Janel alleges "[t]he Trustees breached their duties of prudent administration and impartiality by allowing [Sharon] to live in the Arizona Property rent-free and all expenses paid for the three years following [Kent's] death." Janel also argues the Trustees had a duty to cause the Arizona property to produce income which would be distributed to her and Kevin. The Trustees assert they "administered the Trust in conformity with the purposes of the Trust" and "made informed decisions considering the difficulties encountered in selling the Arizona Property and the need to maintain the property in good condition." The Trustees also assert they took appropriate steps to ensure the Arizona property was protected and properly maintained, and they avoided unnecessary expenses by utilizing Sharon to care for the Arizona property instead of hiring a property management company.

[¶35] Janel also alleges the Trustees breached their duty of impartiality when they made distributions to Kevin without offering the same opportunity to Janel. She asserts the district court "misconstrued the words impartial and equal[,]" and the Trustees did not treat her and Kevin equally or impartially over time. The Trustees allege there is no evidence in the record that shows they did not act in a disinterested or unbiased manner toward both Janel and Kevin.

## A. The Arizona Property

### 1. *Allowing Sharon to Live in the Arizona Property*

[¶36] In the proceedings below, Janel asked the district court to find the Trustees committed numerous breaches of administration in their handling of the Arizona property. She alleged the Trustees' decision to allow Sharon to remain in the home rent-free was inconsistent with a genuine intention to sell the property. She also alleged the Trustees breached their duty of prudent administration when they expended significant sums to pay the utilities and maintain the landscaping and pool while the property was on the market.

[¶37] The district court found the Trustees acted properly by placing the Arizona property up for sale in a timely manner. The district court further found that while the Trustees could have perhaps done more to encourage Ms. Beal to show the home, the circumstances surrounding the lengthy process of selling the Arizona property were beyond the Trustees' control. The district court also found there was no evidence to support the allegation that the Trustees purposely delayed the sale of the Arizona property for their own benefit, and the Trustees made reasonable decisions to protect Trust property and minimize fees assessed to the Trust. The district court also found:

> [T]he decision to continue to maintain the property and pay utilities, especially during the brutally hot Arizona summers, were a necessary expenditure to protect the Trust property. The

11

expenses incurred with maintaining the property and the utilities would have been paid by the Trust regardless of whether [Sharon] remained in the home or if there had been a lease of the property. The incursion of the costs for utilities and maintenance of the Arizona property were appropriate under Wyo. Stat. § 4-10-805 as they were "reasonable in relation to the trust property" and the "purposes of the trust."

Based on these findings, the district court concluded the Trustees did not breach their duties of prudent administration, loyalty, or impartiality by allowing Sharon to remain living in the Arizona property.

[¶38] The record supports the district court's findings and conclusions. It is undisputed that the Arizona property had to be sold so the Trustees could pay the specific gifts. The evidence did not establish the Trustees allowed Sharon to reside in the house rent-free to provide her with a benefit to which she was not entitled under the terms of the Trust. Instead, the Trustees asked Sharon to remain in the home so it would be well cared for and ready for showings. Ms. Crissman testified the Trustees were motivated to sell the house as quickly as possible and for as much money as they could get. Janel admitted it would have been reasonable to allow Sharon to stay in the Arizona property for a couple of months to get her belongings packed up and the property ready to sell. Janel also admitted the Trustees could not have known it would take approximately two-and-a-half years to sell the Arizona property. Janel's expert admitted there were other homes in the Wickenburg area that were on the market for extremely long periods of time.

[¶39] Janel also admitted that if Sharon had not stayed in the home, the Trustees would have had to hire a property management company to watch over the property until it was sold. The Trustees testified they did not think about hiring a property manager because this would cause the Trust to incur additional costs, and they did not think a property manager would care for the home as well as Sharon would. Janel also questioned whether it was necessary to maintain the landscaping and pool. However, Ms. Crissman testified the pool was a major selling point for the Arizona property, and it was important to keep the pool clean and functional. Even Janel's expert admitted draining the pool would not have helped sell the property.

[¶40] The district court correctly concluded the Trustees did not breach their duties of prudent administration or impartiality by allowing Sharon to remain in the Arizona home and paying for utilities and maintenance while it was on the market.

### 2. *Failure to Make the Arizona Property Productive*

[¶41] In the proceedings below, Janel argued the Trustees had a duty to cause the Arizona property to produce income, and they breached this duty when they chose not to rent out

12

the property while it was on the market. She alleged that during the 32 months Sharon resided in the property, the Trustees could "theoretically" have generated over $51,000 in income.

[¶42] The district court found "[w]hether or not rent could have been generated and at what price, whether renting would have delayed the sell [sic] or reduced the potential buyers, and whether a disinterested renter would fail to maintain the home is all speculation." The district court concluded the Trustees "exercised reasonable care, skill, and caution in handling the sale of the Arizona property, especially considering the distributional requirement of the specific gifts. The [Trustees] acted in good faith, in accordance with the Trust's terms and purposes and the interest of the beneficiaries, and in accordance with their duties." Based on these findings, the district court concluded the Trustees did not breach their duty of prudent administration by not renting out the Arizona property.

[¶43] The record supports the district court's findings and conclusions. Under section 4.2 of the Second Amendment to the Trust, the Trustees were directed to sell the Arizona property at its fair market value to pay the specific gifts. Under Section 4.4, the specific gifts had to be paid before any income payments were made to Janel or Kevin. The Trustees promptly placed the Arizona property up for sale, they hoped the property would sell in less than six months, and they had no way of knowing the property would take almost three years to sell. Although Janel acknowledges these facts, she still claims the Trustees should have rented out the Arizona property.

[¶44] Janel's expert testified if the Trustees had rented out the Arizona property for a term of a year or more, they could have received a monthly rent of $1,070. If they had rented out the house as a short-term rental, they could have received a monthly rent of $1,606. Although Janel's expert admitted it was customary in that area for the owner of a rental property to pay the utilities on the property, he did not include calculations for maintenance costs, repair costs, or utilities when arriving at his estimated rental value. He also admitted he did not consider the fact that the property was up for sale.

[¶45] The evidence at trial established the Trustees did not consider renting out the Arizona property while it was on the market because they believed it would be difficult to find a tenant while the home was listed, and if the property was encumbered by a lease, it would be more difficult to sell. They also believed the Arizona property would not have made a good rental property because the pool and yard required too much maintenance. Janel admitted renting the property to a third party could potentially cause problems. She also admitted having the home on the market could make it more difficult to find a tenant, and having a lease attached to the property could make it more difficult to find a buyer. According to Ms. Crissman, Wickenburg is a retirement community, and there are not many rental properties in the area where the Arizona property was located. Even Janel's expert admitted long-term rentals were not common in the Wickenburg area, and there

13

were no other rental properties in the immediate vicinity of the Arizona property. Ms. Crissman also testified that under Arizona law, if a property is occupied by a tenant, that tenant must be given at least 48 hours' notice of a showing. However, Sharon would allow Ms. Crissman to show the home with only 30 minutes' notice.

[¶46] We agree with the district court that the Trustees "exercised reasonable care, skill, and caution in handling the sale of the Arizona property, especially considering the distributional requirement of the specific gifts." We also agree the Trustees "acted in good faith, in accordance with the Trust's terms and purposes and the interests of the beneficiaries, and in accordance with their duties." We affirm the district court's ruling that the Trustees did not breach their duty of prudent administration by not attempting to rent out the Arizona property while it was on the market.

## B. Disbursements to Kevin

[¶47] In the proceedings below, Janel asserted the Trustees breached their duty of impartiality when they made advancements to Kevin but failed to offer the same to Janel. She also alleged the "loan" to Kevin was not evidenced by a note, and it did not accrue interest. She asserted the Trustees could have invested that sum to generate additional income. She also asserted that while this distribution may not have damaged the Trust, it was unequivocally another instance of the Trustees' breach of their duty of impartiality.

[¶48] The district court found the Trustees did not breach their duty of impartiality by advancing this sum to Kevin because the Trustees paid Janel and Kevin "the exact same amount of income from the Trust." Janel alleges the district court "erroneously concluded that impartial treatment means equal regarding distributions, which is not the case." The Trustees assert the payments to Kevin were appropriate under the terms of the Trust, and they did not have any obligation to offer Janel a similar advancement. In addition, the Trustees argue that Kevin did not receive more from the Trust than he was owed, and by equalizing the first income payment, the Trustees showed they did not favor Kevin over Janel.

[¶49] The record shows these distributions were specifically allowed by the terms of the Trust. Section 4.5 of the Trust states:

> Until complete distribution pursuant to the provisions of this paragraph, the Trustee may distribute to or apply for the benefit of Grantor's Income Beneficiaries, out of the principle of the Trust, those sums as the Trustee, in the Trustee's discretion, considers necessary for their proper support, maintenance, health and education, and the purchase of a primary residence after taking into consideration, to the extent the Trustee considers advisable, any income or other resources of theirs

14

known to the Trustee and reasonably available for those purposes.

Section 6.13 of the Trust states in relevant part:

> The Trustee is authorized to loan funds or assets belonging to the Trust Estate to Grantor, to the probate estate of Grantor, to any Beneficiary hereunder, or to any other person, firm or entity, upon such terms and in such amounts as the Trustee may deem advisable; provided, that any such loan bears a reasonable rate of interest, but not more than the maximum interest rate allowed under Wyoming law, and provided that any such loan is adequately secured.

Section 6.30 of the Trust states:

> **Discretion of Trustee.** Unless specifically limited, all discretions conferred upon the Trustee shall be absolute, and its exercise conclusive on all persons interested in the Trusts [sic]. The enumeration of certain powers of the Trustee shall not limit its general powers, the Trustee being vested with and having all the rights, powers and privileges with relation to the Trust Estate as could be exercised and executed by an individual holding and owning the same property in absolute and unconditional ownership. All powers of the Trustee shall be exercised in a fiduciary capacity.

[¶50] The record supports the district court's findings and conclusions. Janel admits the Trust authorized the Trustees to make loans. Janel also admits she never asked for a loan. She also did not object to the Trustees loaning the money to Kevin. Her complaint is that the Trustees did not offer to advance her the same amount. Because the Trustees did not charge Kevin interest on the sums advanced to him in 2016, these sums were more likely distributions of principal under Section 4.5 than loans under Section 6.13. However, under Sections 4.5 and 6.30, the Trustees had the discretion and authority to make such distributions. Neither Section 4.5 or 6.13 require the Trustees to offer to make equal distributions or loans to the other beneficiaries if the Trustees have found in their discretion that such a distribution or loan should be made to one beneficiary.

[¶51] We affirm the district court's conclusion the Trustees did not breach their duty of impartiality by making these distributions to Kevin.

### III. Did the District Court Err When It Failed to Remove the Trustees or Award Other Damages?

[¶52]  If the Trustees violated any of the fiduciary duties they owed to Janel and the other beneficiaries, it constitutes a breach of trust. Wyo. Stat. Ann. § 4-10-1001(a) (LexisNexis 2021).  Among other remedies for a breach of trust, a court may "[c]ompel the fiduciary to redress a breach of trust by paying money" or remove the trustee as provided in Wyoming Statute § 4-10-706. Wyo. Stat. Ann. § 4-10-1001(b)(iii), (vii).  Janel alleges the district court erred when it declined to remedy the Trustees' breaches of trust by awarding her monetary damages relating to the sale of the Texas condo, awarding her attorney's fees, or removing the Trustees.

### A.  Damages Relating to the Sale of the Texas Condo

[¶53]  The district court found Rosemary violated her duties of loyalty and impartiality "by entering into a transaction on behalf of herself and as a trustee," and Jacque breached her duties of loyalty and impartiality through her "inaction and inattention to this transaction . . . ."[3]  When discussing whether damages should be awarded for this breach, the district court found the amount Rosemary paid for the condo was close to the average of the parties' experts' opinions of value, so Janel failed to prove a loss to the Trust.

[¶54]  Janel asserts the district court erred when it decided not to award damages after finding the Trustees breached their duties of loyalty and impartiality.  She argues the district court should have awarded her damages in the amount of $21,000, which is the difference between the price Rosemary paid for the Texas condo and Janel's expert's opinion of the fair market value of the condo.[4]  The Trustees argue the district court

---

[3] The Trustees pointed out in their written closing argument that the Trust has a provision that specifically allows self-dealing.  Section 6.29 of the Trust specifically allows the Trustees to purchase Trust assets, and it states the Trustees would not be liable for any loss or diminution resulting from such a transaction unless the Trustees acted in bad faith or with willful malfeasance.  The district court did not apply this provision when analyzing the Trustees' alleged breach of their duty of loyalty or when making its damages determination.  The district court made no findings about whether the Trustees acted in bad faith or with willful malfeasance in their actions surrounding the purchase of the Texas condo. Instead, it applied the general rule that prohibits any self-dealing by a trustee.  Because neither party challenged the district court's finding that the Trustees breached their duty of loyalty, we will not address it other than to note: Whether a trustee breached her duty of loyalty is "ultimately dependent on the terms of the trust." *Forbes II*, 2022 WY 59, ¶ 53, 509 P.3d at 903 (quoting Restatement (Third) of Trusts § 78 cmt. c(2) (Am. L. Inst. 2007)). "[N]o matter how broad the provisions of a trust may be in conferring power to engage in self-dealing or other transactions involving a conflict of fiduciary and personal interests, a trustee violates the duty of loyalty to the beneficiaries by acting in bad faith or unfairly." *Id.* (quoting Restatement (Third) of Trusts § 78 cmt. c(2)).  "[W]hile we recognize that a beneficiary is entitled to the trustee's proper exercise of its fiduciary duty, our consideration of a breach of fiduciary claim is 'governed by the settlor's intent, not the beneficiaries' preferences.'" *Shriners Hosps. for Children v. First N. Bank of Wyo.*, 2016 WY 51, ¶ 61, 373 P.3d 392, 410 (Wyo. 2016) (quoting *Rock Springs Land and Timber, Inc. v. Lore*, 2003 WY 100, ¶ 25, 75 P.3d 614, 624 (Wyo. 2003)).

[4] Janel also seeks damages for the "windfall" Rosemary received when she sold the condo for more than

16

correctly concluded Janel failed to prove a loss to the Trust.

[¶55] The evidence presented at trial shows Rosemary's belief that the condo was worth less than $122,000 was objectively reasonable. The Trustees' expert opined the fair market value of the Texas condo on the day Kent passed away was $105,000. This opinion included adjustments for the condo's reported condition issues. Although he had no way to verify the information Rosemary gave him about the property's condition, he also testified he had no reason to discount that information. The Trustees' expert testified a mold issue would have to be disclosed to a potential buyer, which would make the property more difficult to sell. He also opined potential buyers would have an adverse reaction to the warped floors, which would impact the price they were willing to pay. The Trustees also presented the district court with a copy of the Harris County Appraisal District Notice of Appraised Value for Property Tax Purposes for the 2016 tax year, which valued the condo at $110,025.

[¶56] Although Janel's expert opined the fair market value of the Texas condo was $143,000, he admitted a property's condition is "probably the most significant factor" when valuing the property. Although he spoke to Rosemary about the condition of the property, he did not consider her information "to the extent that [he] could have" because he believed she was an interested party, even though he had no evidence that Rosemary's information was inaccurate. He admitted having mold substantially affects a property's value, and if he had been able to verify the property had mold and warped floors, his opinion of value would be lower.

[¶57] Because Janel failed to prove a loss to the Trust, we affirm the district court's decision not to award damages relating to the sale of the Texas condo.

## B. Attorney's Fees

[¶58] Janel asserts "the Trustees' failures to account and inform" her about the Trust "resulted in her need to retain counsel and sue in this matter[,]" and as such, she should have her attorney's fees reimbursed by the Trustees. The Trustees assert the district court did not abuse its discretion when it declined to award attorney's fees because the Trustees

---

$200,000 approximately 18 months after she purchased it. She asserts Rosemary's $78,000 profit should be recapitalized to the Trust under Wyoming Statute § 4-10-1003 because this sum represents "profits made by the fiduciary arising from the administration of the trust." The district court found it was concerning that Rosemary was on the HOA board of the condominium complex at the time she purchased the condo, and that she sold the property over a year later at a profit. However, the district court implicitly rejected Janel's argument about being entitled to the windfall when it did not award Janel any damages for the Trustees' breach of their duties of loyalty and impartiality. We too reject this argument. The evidence admitted at trial showed Rosemary did not know a developer was interested in purchasing the entire complex at the time she purchased the condo from the Trust. There is no evidence in the record to support Janel's allegation that Rosemary acted inappropriately when she sold the condo or that the amount Rosemary received from the sale should be paid over to the Trust.

"took no action regarding the Trust which the [d]istrict [c]ourt could find was taken with utter disregard to [Kent's] intentions, or acted in bad faith."

[¶59]   "Wyoming follows the American rule regarding attorney's fees, which provides that each party is responsible for his or her own attorney['s] fees." *Acorn*, 2016 WY 124, ¶ 84, 386 P.3d at 763 (citing *Positive Progressions*, *LLC v. Landerman*, 2015 WY 138, ¶ 29, 360 P.3d 1006, 1016 (Wyo. 2015); *Thorkildsen v. Belden*, 2012 WY 8, ¶ 10, 269 P.3d 421, 424 (Wyo. 2012)).   Under this rule, attorney's fees are recoverable only where authorized by a contractual or statutory provision. *Id.* (quoting *Positive Progressions, LLC*, ¶ 29, 360 P.3d at 1016).   The Uniform Trust Code gives the district court the authority to award attorney's fees:

> In a judicial proceeding involving the administration of a trust, the court, **as justice and equity may require**, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy.

Wyo. Stat. Ann. § 4-10-1004 (LexisNexis 2021) (emphasis added).   Under this statute, the district court "has extremely broad discretion to rule on the amount of such an award." *Acorn*, ¶ 85, 386 P.3d at 764 (quoting *Shriners Hosps. for Children*, 2016 WY 51, ¶ 108, 373 P.3d at 418).

> In reviewing the district court's determination of the amount, if any, to award [to Janel] in this case, we are mindful that we have held that we will not interfere with the trial court's exercise of discretion in making such an award except upon proof that such discretion was gravely abused.

*Id.* (quoting *Shriners Hosps. for Children*, 2016 WY 51, ¶ 108, 373 P.3d at 418).

> A court abuses its discretion when it acts in a manner which exceeds the bounds of reason under the circumstances.   The party who is attacking the trial court's ruling has the burden to establish an abuse of discretion, and the ultimate issue is whether the court could reasonably conclude as it did.

*EOG Res., Inc. v. JJLM Land, LLC*, 2022 WY 162, ¶ 12, 522 P.3d 605, 609 (Wyo. 2022) (quoting *Meiners v. Meiners*, 2019 WY 39, ¶ 9, 438 P.3d 1260, 1266 (Wyo. 2019)).

[¶60]   The district court recognized it had authority under Wyoming Statute § 4-10-1004 to award attorney's fees and costs as "justice and equity may require."   The district court found Janel had not shown any just or equitable reason why her attorney's fees and costs

18

should be paid by the Trustees or the Trust.

[¶61]  We have found the Trustees did not breach their duties of loyalty, impartiality, or prudent administration.  Although we found the Trustees breached their duty to inform and report, we also found the Trustees remedied their breach of this duty by promptly providing all the information Janel requested.  Ultimately Janel failed to prove the Trust sustained any damages as a result of the Trustees' administration of the Trust.  Therefore, the district court could have reasonably concluded it would not be just or equitable to award Janel her attorney's fees.  We affirm the district court's decision not to award attorney's fees.

## C. Removing the Trustees

[¶62]  "We review a district court's decision whether to remove a trustee for an abuse of discretion." *Redland*, 2019 WY 17, ¶ 30, 435 P.3d at 360 (citing *Forbes I*, 2015 WY 13, ¶ 33, 341 P.3d at 1053).

> "A settlor has a great deal of discretion in designating a trustee" and can appoint a trustee who is an interested party, such as a beneficiary, despite inherent conflicts.  Generally, the court will not remove a trustee absent a demonstrated abuse of power. So long as the trustee executes a trust in good faith and sound discretion, the court has no right to interfere and remove the trustee.

*Redland*, ¶ 31, 435 P.3d at 360–61 (internal citations omitted).  Under the Uniform Trust Code, a trustee may be removed in the following circumstances:

> (i) The trustee has committed a serious breach of trust;
>
> (ii) Lack of cooperation among cotrustees substantially impairs the administration of the trust;
>
> (iii) Because of unfitness, unwillingness or persistent failure of the trustee to administer the trust effectively, the court determines that removal of the trustee best serves the interests of the beneficiaries; or
>
> (iv) There has been a substantial change of circumstances, or removal is requested by all of the qualified beneficiaries, and the court finds that removal of the trustee best serves the interests of all of the beneficiaries and is not inconsistent with a material purpose of the trust, and a suitable cotrustee or successor trustee is available.

Wyo. Stat. Ann. § 4-10-706(b) (LexisNexis 2021). "[C]ourts are more reluctant to remove a settlor-appointed trustee than one who is court-appointed." *Redland*, ¶ 32, 435 P.3d at 361 (citing *Forbes I*, ¶ 30, 341 P.3d at 1052). There must be "an enhanced showing of gross and willful misconduct to justify removing a settlor-appointed trustee. *Id.* (citing *Shriners Hosps. for Children*, 2016 WY 51, ¶ 97, 373 P.3d at 416).

[¶63] The district court concluded Janel had not shown the Trustees committed a serious breach of trust that would require removal of the Trustees, nor had she shown the Trustees persistently failed to effectively administer the trust. The district court also found Janel had not shown a substantial change in circumstances, and she was the only beneficiary requesting the removal of the Trustees. The district court further found:

> Given the short amount of time [the Trustees] have administered the Trust and the actions they have undertaken to do so, their compliance with the formal request to provide all documentation to the beneficiaries, and their efforts to maintain contact with the beneficiaries and reasonably inform them of the status of the trust, there is no good basis to take such action.

The district court noted that while there had been some disagreement between Janel and the Trustees, there was no indication the Trustees would not continue to administer the Trust impartially.

[¶64] We agree with the district court. Although the Trustees breached their duty to inform and report, Janel did not make "an enhanced showing of gross and willful misconduct" that would justify removing the settlor-appointed Trustees. *Redland*, ¶ 32, 435 P.3d at 361 (citing *Shriners Hosps. for Children*, 2016 WY 51, ¶ 97, 373 P.3d at 416). We affirm the district court's decision not to remove the Trustees.

## CONCLUSION

[¶65] The district court correctly found the Trustees did not breach their duties of impartiality or prudent administration. The district court also correctly determined Janel was not entitled to damages relating to the sale of the Texas condo. The district court incorrectly determined the Trustees did not breach their duty to inform and report. However, Janel failed to prove the Trust sustained damages as a result of the Trustees' breach of that duty, so she is not entitled to damages for the breach of that duty. We affirm the district court's decision not to award monetary damages, attorney's fees, or remove the Trustees.